# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

AMBER HANSON,

        Plaintiff,

v.                                    **MEMORANDUMOF LAW & ORDER**
                                  Civil File No. 12-540 (MJD/JJK)

MENTAL HEALTH RESOURCES, INC.,

        Defendant.

Kevin M. Beck, Kelly & Lemmons, PA, Counsel for Plaintiff.

Joseph G. Schmitt and Katie M. Connolly, Nilan Johnson Lewis PA, Counsel for Defendant.

## I.     INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary

Judgment.  [Docket No. 13]  The Court heard oral argument is on May 3, 2013.

For the reasons that follow, the Court grants Defendant's motion.

## II.     BACKGROUND

### A.     Factual Background

1.     **The Parties**

Defendant Mental Health Resources, Inc. ("MHR") is a private non-profit

corporation that provides services to people with severe and persistent mental

illness in order to increase their quality of life by minimizing arrests,

homelessness, and unnecessary hospitalizations.  (Connolly Aff., Ex. 1,

Calmbacher Dep. 7-8.)  It offers services such as counseling and psychotherapy,

case management, housing and vocational support, and skills training.  (Berg

Aff. ¶ 2.)  MHR employs approximately 170 employees, the vast majority of

whom are women.  (Calmbacher Dep. 8, 33.)

MHR has two ERISA-governed employee welfare plans: a pension plan

(Mental Health Resources Profit Sharing Plan) and a plan encompassing

employer-sponsored health benefits.  (Connolly Aff., Ex. 2, Berg Dep. 15.)

Plaintiff Amber Hanson began working for MHR as a case manager on

September 13, 2010.  (Connolly Aff., Ex. 3, Hanson Dep. 7.)  Her job

responsibilities included assisting mentally ill and chemically dependent adults

access services in the community, including medical and psychiatric treatment

providers, helping clients with coping skills, and providing crisis intervention

when needed.  (Id.)  MHR admits that her performance as a case manager was

satisfactory, apart from the particular incident that led to her termination.  (See,

e.g., Connolly Aff., Ex. 6, Tisdle Dep. 47.)

### 2. Hanson's Insurance Forms

At the beginning of Hanson's employment, she completed standard

employment forms relating to benefits, including forms related to insurance

coverage offered under MHR's ERISA-governed health benefits plan.  (Hanson

Dep. 18.)  She received these forms as part of her orientation.  (Id. 26.)  During

orientation, conducted by Human Resources Assistant Pha Vang, Hanson asked

Vang if domestic partners could be covered under MHR's benefits policy.  (Id.

31.)  Vang said "yes," and told Hanson that she needed to complete the domestic

partnership affidavit, which Vang provided.  (Id.)  Vang did not give Hanson

any instruction regarding how to fill out her enrollment forms in light of

Hanson's request for the domestic partnership affidavit; nor did Vang explain

the domestic partnership affidavit or the criteria for qualifying for domestic

partnership coverage.  (Hanson Dep. 34; Connolly Aff., Ex. 10, Vang Dep. 17-18.)

Vang did not provide instruction because the domestic partnership affidavit

clearly states the required qualifying information.  (Vang Dep. 17-18.)  The

affidavit and MHR's domestic partnership policy has existed for at least ten

3

years, and the qualifying information has never changed.  (Berg Aff. ¶ 4.)  A key

qualification for MHR's domestic partnership coverage is that the applicant is in

a same-sex relationship.  (Id.; Berg Dep. 78.)

After taking the documents from Vang, Hanson completed the enrollment

forms and affidavit.  Vang was not with Hanson when Hanson completed her

initial enrollment forms.  (Vang Dep. 16.)  On Hanson's HealthPartners "Medical

Enrollment Form," signed by Hanson on September 20, 2010, Hanson elected to

participate in MHR's family Health Savings Account insurance plan.  (Connolly

Aff., Ex. 11.)  She identified two "dependents:" Jacob Mildon, identified by

Hanson as her "spouse," and M.M., identified as her son.  (Connolly Aff., Ex. 11;

Hanson Dep. 19.)  The form includes a box where Hanson was supposed to check

married or single, but she did not check either.  (Connolly Aff., Ex. 11; Hanson

Dep. 20.)  At the time that Hanson completed the medical insurance enrollment

form, she was not legally married to Jacob Mildon, but she claims that she used

the term "spouse," because she uses that term interchangeably with the term

"partner."  (Hanson Dep. 20-21, 24-25.)  She does not believe, however, that Jacob

Mildon is her spouse "in the eyes of the law."  (Id. 20.)  At the bottom of the

4

form, Hanson signed, agreeing "I hereby declare all answers to be true and complies [sic] with the best of my knowledge."  (Connolly Aff., Ex. 11.)

Also on September 20, 2010, Hanson completed a HealthPartners "Dental Enrollment Form."  (Hanson Dep. 22; Connolly Aff., Ex. 12.)  She listed both Jacob Mildon and M.M. as her dependents and identified Jacob Mildon as her "spouse."  (Hanson Dep. 22-23; Connolly Aff., Ex. 12.)  However, she checked the "single" box.  (Connolly Aff., Ex. 12.)

On September 14, 2010, Hanson completed a life/disability insurance form and identified Jacob Mildon as her beneficiary and her "partner."  (Hanson Dep. 23-24.)

Additionally, Hanson signed the MHR domestic partnership affidavit, affirming that the affiants – Hanson and Jacob Mildon – were "Same sex adults." (Connolly Aff., Ex. 13.)  Both Hanson, a female, and Jacob Mildon, a male, signed the document and had their signatures notarized on October 11, 2010.  (Id.) Hanson admits that, at the time she and Jacob Mildon signed the document and submitted it to MHR, they were not same-sex adults.  (Connolly Aff., Exs. 14-15.)

Hanson submitted her domestic partnership affidavit and her enrollment forms to Vang on approximately October 13, 2010.  (Hanson Dep. 38-39.)  Vang

faxed the medical and dental enrollment forms along with the domestic

partnership affidavit and a cover letter to MHR's then-insurer, HealthPartners.

(Vang Dep. 20-22; Connolly Aff., Ex. 13.)  After Vang faxed the documents, she

put a copy of the faxed documents into a separate fax file that she maintained at

that time.  (Vang Dep. 11-12.)  She also placed a copy of the medical and dental

enrollment forms in Hanson's personal health information file, but accidentally

forgot to place a copy of the domestic partnership affidavit in that same file.  (Id.

53-54.)

Vang did not review the enrollment forms or the domestic partnership

affidavit.  (Vang Dep. 21-22.)  She did not check the documents for content or

consistency.  (Id. 25-26.)  She claims that she was overseeing many employees

and did not have the capacity to review each enrollment in detail.  (Id. 26.)

HealthPartners issued coverage to Hanson, Jacob Mildon, and M.M. without any

follow-up requests to MHR.  (Id. 23, 25.)

In November 2010, MHR changed insurance carriers from HealthPartners

to Medica.  (Hanson Dep. 43; Connolly Aff., Ex. 16.)  Hanson was required to

complete a new enrollment form and, on that form, she identified Jacob Mildon

as one of her dependents, as male, and as her domestic partner.  (Hanson Dep.

44; Connolly Aff., Ex. 16.)  She did not check the box for "single" or for "married" in the "Marital Status" section of the form.  (Id.)

In December 2010, Hanson decided to drop all of her dependents from her dental benefits.  (Hanson Dep. 45-46; Connolly Aff., Ex. 17.)  To do so, she submitted a form on which she identified Jacob Mildon as her domestic partner. (Id.)

### 3.    Hanson's Leave Request

In October or November 2011, Hanson began telling her co-workers that she was pregnant.  (Hanson Dep. 79.)  On December 1, 2011, she received Family and Medical Leave Act ("FMLA") paperwork that she had requested from Vang in anticipation of the birth of her child in March 2012.  (Id. 81-82; Connolly Aff., Ex. 19.)  The paperwork stated that she was eligible for FMLA leave.  (Hanson Dep. 82; Connolly Aff., Ex. 19.)

Hanson submitted the required documentation from her physician and, on January 10, 2012, received notification that her leave request was approved for twelve weeks, although she only requested eight weeks.  (Connolly Aff., Ex. 20; Hanson Dep. 86-88.)

### 4.      MHR Discovers the Discrepancies in Hanson's Benefits Forms

In November 2011, shortly before Thanksgiving, Hanson approached MHR's Finance Director, Robert Berg, to ask about benefits and what insurance plan to choose in light of her pregnancy and the anticipated birth of her second child in March 2012.  (Hanson Dep. 49, 52-53.)  Vang was on maternity leave at the time, which is why Hanson approached Berg.  (Id.)  During the conversation, Hanson mentioned that she and Jacob Mildon were not married and that she carried him as a dependent on her MHR insurance.  (Id. 53.)  Berg told Hanson that MHR does not provide benefits to unmarried opposite-sex partners and that she would have to remove him from the policy.  (Id.)  Hanson thinks that she told Berg that she had completed the domestic partnership affidavit, and that Berg responded by telling her that Vang should never have permitted Hanson to have an opposite-sex partner on the policy. (Id. 53-54.)  Hanson removed Jacob Mildon from her MHR insurance, but not directly after the conversation with Berg.  (Id. 77.)

After the conversation, Berg was concerned about how Hanson had enrolled her opposite-sex domestic partner for MHR's benefits since MHR had a longstanding policy of only permitting married spouses and, because marriage

was not an option for them, same-sex domestic partners to receive benefits.

(Berg Dep. 78, 98.)  He looked through Hanson's personnel file and her personal

health information file.  (Id. 82.)  He also placed a blank copy of the domestic

partnership affidavit, which lists the criteria for receiving domestic partner

benefits, including that the affiants be in a same-sex relationship, in Hanson's

mailbox.  (Id. 92.)

On November 18, 2011, shortly after Hanson's conversation with Berg,

Hanson received an email from Berg.  (Hanson Dep. 58; Connolly Aff., Ex. 18.)

The email summarized their conversation and reiterated that domestic partner

benefits only applied to same-sex adults, having Hanson's opposite-sex domestic

partner on her health insurance violated MHR policy, and she needed to remove

him by January 1, 2012. (Connolly Aff., Ex. 18.)  The email stated that Hanson

had told him that she had completed the domestic partnership form but that no

such form had been found in her file.  (Id.)  After receiving Berg's email, Hanson

did not respond; nor did she ask to see her personnel file.  (Hanson Dep. 59.)

When Vang returned from her own maternity leave in early December

2011, Berg asked her what happened during Hanson's initial enrollment and

asked her to review Hanson's files.  (Berg Dep. 82.)  After Vang looked through

Hanson's files, she told Berg that she could not locate a domestic partner affidavit submitted by Hanson and that she was not aware that Hanson was not married to the adult male that she was carrying on her insurance.  (Berg Dep. 94; Vang Dep. 51-52, 60.)  At that time, Vang did not remember that she had received a completed domestic partnership affidavit from Hanson and told Berg that if the affidavit was not in Hanson's files, then MHR did not have it.  (Vang Dep. 52-54.)

After talking to Vang, Berg pulled Hanson's original enrollment documents and noticed "some discrepancies."  (Berg Dep. 96.)  Berg did not do anything about the discrepancies at that time because he then went on vacation and, when he returned, at the end of December 2011, it was month end and he was working on getting things closed out for accounting.  (Id. 100.)  Berg then talked to William Calmbacher, MHR's Operations Director, and told him that Hanson had misrepresented information on the insurance forms.  (Id. 103-04.)  Calmbacher told Berg that he thought doing so was a terminable event.  (Connolly Aff., Ex. 1, Calmbacher Dep. 59.)  Berg agreed that he was very concerned because Hanson had not been honest and honesty was very important to MHR.  (Berg Dep. 104-05.)  However, Berg and Calmbacher had to wait for

MHR's Executive Director to return from vacation and for an investigation by the new Human Resources Manager before acting.  (Id. 104.)

In mid-January 2012, Berg asked MHR's newly hired Human Resources Manager, Lisa Nguyen, to conduct her own investigation into the incident.  (Berg Dep. 109.)  Nguyen reviewed all of the files, talked with Vang, and consulted with legal counsel.  (Id. 112-14.)  She concluded that she believed that Hanson had been dishonest and fraudulent in completing her insurance enrollment forms to put someone on her health insurance as her spouse when they were not married.  (Id. 112-13.)

During or shortly after Nguyen's investigation, Berg discussed the fact that Hanson had dishonestly obtained coverage for her opposite-sex unmarried partner on her health insurance with MHR's Executive Director, Kathy Gregersen, who usually makes final termination decisions.  (Berg Dep. 50, 116-17; Connolly Aff., Ex. 6, Tisdle Dep. 33.)  Calmbacher was present for the discussion. (Berg Dep. 115, 117.)  Gregersen was upset that Hanson had misrepresented her partner as her spouse on her enrollment forms.  (Berg Dep. 116.)  Gregersen, Berg, and Calmbacher agreed that the conduct was dishonest, fraudulent, and a

terminable offense, but did not make a final decision on termination.  (Id. 117-

18.)

Gregersen, Berg, and Nguyen then met to discuss the situation.  Nguyen

reported her findings, including the advice she had received from legal counsel.

(Berg Dep. 111.)  The three agreed to terminate Hanson because she had falsely

identified Jacob Mildon as her "spouse."  They believed that "spouse" has the

same meaning as "married," and that a reasonable person would expect that

when a person uses the term "spouse," they are referring to a legal marriage.

(Berg Dep. 127, 130; Gregersen Aff. ¶ 2; Nguyen Aff. ¶ 3.)  In Hanson's

deposition, she admitted that a standard interpretation of the word "spouse" is

that it indicates a legal marriage.  (Hanson Dep. 77, 122.)

Berg did notice that Hanson had checked the "single" box on one of her

initial enrollment forms, but determined that this action did not mitigate her

dishonesty is listing Jacob Mildon as her "spouse" when they were not married,

lying about her relationship in order to put him on MHR's insurance. (Berg Dep.

129-30.)  All three decision makers aver that that the only reason they decided to

terminate Hanson was because she had falsely identified Mildon as her "spouse"

when they were not, in fact, married.  (Id. 133, 149-51; Gregersen Aff. ¶¶ 3-5; Nguyen Aff. ¶¶ 2-5.)

### 5.   Termination of Hanson's Employment

On the morning of January 23, Hanson met with Berg and Calmbacher. (Hanson Dep. 118-19.)  Berg told her that she had identified Jacob Mildon as her spouse on her insurance enrollment forms, this was "fraudulent," and MHR was terminating her as a result.  (Id. 118-19.)  Hanson asserts that Berg told her that, because Jacob Mildon is male, she had the right to marry him.  (Id. 152, 188.) Hanson told him that she would never do anything fraudulent on purpose and asked if there was anything she could do.  (Id. 119.)  Berg told her no, asked her to turn over her MHR materials, and said that she would be escorted out.  (Id.) He handed her a termination letter at the end of the meeting.  (Id. 120.)

Hanson testified that no one at MHR ever said anything to her that led her to believe that she was terminated because of her pregnancy, sex, or her leave requests.  (Hanson Dep. 150-52, 187.)  She testified that the only statement that was ever made to her that she believes indicates that she was terminated because of her sexual orientation or marital status was Berg's comment that she had the right to marry Jacob Mildon.  (Id. 152, 188-89.)

13

After Hanson was terminated, she was replaced with two heterosexual female employees.  (Nguyen Aff. ¶ 6.)  One was married and the other was not married.  (Id.)  Neither woman was pregnant at the time she took over Hanson's duties.  (Id.)

### 6.    MHR's Honesty Policy

Honesty is a paramount employee characteristic for MHR because it serves vulnerable adults and because it is subject to strict compliance guidelines as a Medicare-Medicaid billing entity.  (See, e.g., Hanson Dep. 17; Berg Aff. ¶ 3; Berg Dep. 106; Calmbacher Dep. 25.)  "Integrity" is identified in MHR's Employee Handbook as one of MHR's Core Values.  (Hanson Dep. 10; Connolly Aff., Ex. 4, Employee Handbook at 4.)  Hanson admits that "integrity" encompasses honesty.  (Hanson Dep. 10.)  MHR's Code of Ethics requires employees to make affirmations including: "I will not exploit the trust of the public or my co-workers," and "I will act in accordance with standards of professional integrity." (Connolly Aff., Ex. 5, MHR Code of Ethics at 5-6; Hanson Dep. 13 (testifying that acting with "professional integrity" includes honesty.)  Hanson admits that adherence to the Code of Ethics was a metric on which her performance was reviewed annually.  (Hanson Dep. 48-49.)

14

### 7.     MHR's FMLA Leave Policy

MHR has granted approximately 13 leaves per year for the last 5 years.

(Nguyen Aff. ¶ 7.)  The majority of these are maternity leaves.  (Id.)  Both

biological and adoptive mothers regularly take maternity leave at MHR.  (Tisdle

Dep. 53.)  Maternity leaves are taken "fairly frequently" because the employee

group is heavily female and mostly of childbearing age, although men at MHR

also take paternity leave.  (Id.)

### B.     Procedural History

On March 1, 2012, Hanson filed a Complaint against MHR in this Court

alleging Count One: Interference with Exercise of FMLA Rights; Count Two:

Retaliation for Exercise of FMLA Rights; Count Three: Interference with Exercise

of Minnesota Parenting Leave Act ("MPLA") Rights; Count Four: Retaliation for

Exercise of MPLA Rights; Count Five: Violation of the Minnesota Human Rights

Act ("MHRA") – Sex; Count Six: Violation of the MHRA – Sexual Orientation;

and Count Seven: Violation of the MHRA – Marital Status.

MHR has now moved for summary judgment on all claims against it.

## III.   DISCUSSION

### A.     Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case."  Amini v. City of Minneapolis, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986)).

## B.    FMLA

The FMLA provides eligible employees up to 12 weeks of unpaid leave during any 12-month period for, among other things, "the birth of a son or daughter of the employee and in order to care for such son or daughter."  29 U.S.C. § 2612(a)(1)(A).

> Two types of claim exist under the FMLA: (1) 'interference' or '(a)(1)' claims in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' or '(a)(2)' claims in which the employee alleges that the employer discriminated against him for exercising his FMLA rights.

Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C.

§ 2615(a)(1)-(2)).  "The difference between the two claims is that the interference

claim merely requires a proof that the employer denied the employee his

entitlements under the FMLA, while the retaliation claim requires proof of

retaliatory intent."  Id. at 1051.  "Although in some circumstances, a given set of

facts will fall clearly into either (a)(1) or (a)(2), it appears that the lines between

the two categories are not hard and fast."  Id. (citation omitted).

### C.     MPLA

Under the MPLA, an employer must allow a qualifying employee to take

six weeks of unpaid leave in connection with the birth of a child.  Minn. Stat. §

181.941, subd. 1.  "An employer shall not retaliate against an employee for

requesting or obtaining a leave of absence as provided by this section."  Id.,

subd. 3.  Courts apply the same analysis to interference and retaliation claims

under the MPLA as they do under the FMLA.  See Hillins v. Mktg. Architects,

Inc., 808 F. Supp. 2d 1145, 1156 (D. Minn. 2011); Halleck v. MMSI, Inc., No. A11–

256, 2011 WL 4531052, at *5-*6 (Minn. Ct. App. Oct. 3, 2011).

### D.     Interference

17

### 1.    Standard for Interference

An employer is prohibited from interfering with restraining, or denying an employee's exercise of or attempted exercise of any right contained in the FMLA.  Interference includes not only refusing to authorize FMLA, but discouraging an employee from using such leave.  It would also include manipulation by a covered employer to avoid responsibilities under FMLA.  An employer's action that deters an employee from participating in protected activities constitutes an "interference" or "restraint" of the employee's exercise of his rights. . . . When an employer attaches negative consequences to the exercise of protected rights, it has "chilled" the employee's willingness to exercise those rights because he or she does not want to be fired or disciplined for doing so.

Stallings, 447 F.3d at 1050 (citations omitted).

"In an interference claim, an employee must show only that he or she was entitled to the benefit denied."  Stallings, 447 F.3d at 1050 (citation omitted).  However, "where an employer's reason for dismissal is insufficiently related to FMLA leave, the reason will not support the employee's recovery," because "strict liability does not apply."  Id. at 1051 (citation omitted).

### 2.    Discussion

Hanson cannot show that MHR's reason for her dismissal is related to her FMLA leave.  All of the evidence in the record supports the conclusion that MHR's decision to terminate Hanson was based on her dishonesty in listing Jacob Mildon as her spouse on her insurance enrollment forms and enrolling him

on her insurance even though he was not a same-sex domestic partner or a

married spouse.  The evidence is undisputed that she listed Jacob Mildon as her

spouse, that he was not her legal spouse at that time, and that Hanson was not

entitled to carry him on her insurance.  The evidence is undisputed that the MHR

decision makers first learned of this fact in November 2011, that an investigation

was set in motion, and that, after three separate MHR employees investigated the

incident, she was terminated.

Timing alone is insufficient to support Hanson's case, particularly when

she requested FMLA leave, at the latest, on December 1, 2011, received the FMLA

paperwork from MHR stating that she was eligible on December 1, 2011, and

was not terminated until January 23, 2012.  It is undisputed that Hanson notified

MHR of her need and desire for FMLA maternity leave by December 1, 2011.  It

is further undisputed that MHR understood that she was requesting FMLA

leave, because it provided her with FMLA paperwork on December 1.

Additionally, MHR routinely grants FMLA and MPLA maternity leaves

each year and Hanson points to no other employee whose leave was subject to

interference.  Hanson admits that no one at MHR ever said anything that led her

to believe that she was terminated because she requested leave.

MHR is entitled to summary judgment on Hanson's FMLA and MPLA

interference claims.

### E.      Retaliation

#### 1.      Standard for Retaliation

The FMLA prohibits employers from discriminating against
an employee for asserting his rights under the Act.  This prohibition
necessarily includes consideration of an employee's use of FMLA
leave as a negative factor in an employment action.  Basing an
adverse employment action on an employee's use of leave . . . is
therefore actionable.

Stallings, 447 F.3d at 1051 (citations omitted).

An employee can prove Leave Act retaliation circumstantially, using
a variant of the McDonnell Douglas method of proof.  To establish a
prima facie case of retaliation, [Hanson] must show that she
exercised rights afforded by the Act, that she suffered an adverse
employment action, and that there was a causal connection between
her exercise of rights and the adverse employment action.

Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002) (citation and

footnote omitted).  "If the employer comes forward with evidence of a legitimate,

nondiscriminatory reason for its treatment of the employee, the employee must

then point to some evidence that the employer's proffered reason is pretextual."

Id. at 833.   The parties agree that Hanson meets the first two elements of the

prima facie case because she requested FMLA leave and she was terminated.

## 2.    Causal Connection

Because Hanson notified MHR of her need for leave seven weeks before she was terminated, there is insufficient temporal proximity between her protected activity and her termination to support a causal connection.  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."  Smith, 302 F.3d at 833.  As the Court explained with respect to the interference claim, MHR has granted an average of 13 leave requests per year for the last 5 years, most for maternity leaves, so there is no history of it taking adverse action against employees who take or request leave. Besides temporal proximity, Hanson has no other evidence to support a causal connection.  Therefore, her attempt to show a prima facie case fails. Furthermore, even if Hanson could meet the prima facie case, she cannot show pretext.

## 3.    Legitimate Non-discriminatory Reason for Termination

MHR has proffered a legitimate non-retaliatory reason for discharging Hanson.  There is no dispute that she identified Jacob Mildon as her "spouse" on

her medical and dental insurance applications and this information was false.

All of the evidence in the record indicates that MHR regarded her use of the

word "spouse" to describe her relationship as dishonest.  Employee dishonesty is

a legitimate non-discriminatory reason for terminating an employee.  See, e.g.,

Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 284 (6th Cir. 2012); Randall v. N.

Milk Prods., 519 N.W.2d 456, 459 (Minn. Ct. App. 1994).

### 4.      Pretext

Hanson cannot show pretext.  There is no dispute that she listed Jacob

Mildon as her spouse even though they were not legally married.  There is no

dispute that she did not qualify under the domestic partnership policy because,

despite her affidavit averring that she was in a same-sex relationship, she was

admittedly in an opposite-sex relationship.  There is no dispute that the decision

makers at MHR did not notice this discrepancy until November 2011, when

Hanson told Berg of her marital status and that Jacob Mildon was on her

insurance.

Even if Hanson did not intend to commit fraud, there is no evidence that

the termination was pretext for FMLA or MPLA discrimination.  Whether

Hanson thought that she was being truthful when she used the term "spouse" is

immaterial because the evidence shows that Berg and the other MHR decision makers reasonably thought that she had lied: "A proffered legitimate, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination." Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006). Also, there is no indication that similarly situated employees outside of Hanson's protected class were treated differently.

Furthermore, the delay between Berg's discovery that Jacob Mildon was improperly on Hanson's insurance and her firing on January 23, 2012, cuts against a finding of pretext. The delay occurred because Berg waited for Vang to return from maternity leave and investigate the issue. Berg then had the new HR manager investigate and consult with outside counsel. Berg then discussed the matter with Gregersen, the ultimate decisionmaker, twice before the decision was made to fire Hanson. The fact that MHR and Berg wanted to ensure that termination was appropriate and, therefore, asked two additional employees to look into the matter, weighs against, not for, a finding of pretext.

Finally, the Court rejects Hanson's assertion that MHR's investigation was inadequate and, thus, shows pretext. Initially, the Court notes that "[t]he

23

appropriate scope of investigation is a business judgment, and shortcomings in an investigation do not by themselves support an inference of discrimination." McCullough v. Univ. of Ark. for Med. Sciences, 559 F.3d 855, 863 (8th Cir. 2009). See also Weesner v. U.S. Bancorp, Civil No. 10–2164 (RHK/LIB), 2011 WL 4471765, at *12 (D. Minn. Sept. 26, 2011) (gathering cases showing that "employer is [not] required to interview an employee about alleged misconduct before termination").  The Court also notes that, here, three different employees investigated the incident, outside counsel was consulted, and management met twice about the issue.  Moreover, there is no dispute that Hanson improperly identified Jacob Mildon as her spouse on her insurance documents and gained a benefit – insurance coverage for him – to which she was not entitled.  The specifics of the investigation cannot show pretext.

MHR is entitled to summary judgment on Hanson's FMLA and MPLA retaliation claims.

### F.    MHRA Claims

Hanson claims that she was terminated because of her sex, her sexual orientation, and her marital status, all in violation of the MHRA.

### 1.     MHR's Domestic Partner Policy

Hanson claims that MHR discriminated against her on the basis of her sexual orientation and her marital status in violation of the MHRA because its benefits policy did not provide coverage for an opposite-sex domestic partner. MHR retorts that Hanson's claims fail because ERISA preempts the MHRA with regard to discrimination based on sexual orientation and marital status.

The Court need not reach the issue of ERISA preemption because the MHRA's prohibition on discrimination based on sexual orientation and marital status does not prohibit MHR's plan.  First, "eligibility for the domestic partner health care benefits for which [Hanson] applied [does] not turn on the marital status of the employee.  Indeed, the individuals whom the complainant claims she was treated differently from with respect to the provision of domestic partner health care benefits have the same marital status as her." Putnam/Northern Westchester Bd. of Co-op. Educ. Servs. v. Westchester Cnty. Human Rights Comm'n, 917 N.Y.S.2d 635, 638-39 (N.Y. App. Div. 2011).  Second, with regard to sexual orientation discrimination, "the reason for offering health care benefits only to same-sex domestic partners is that same-sex domestic partners cannot obtain benefits offered by [MHR] to employees' spouses by becoming lawfully married in this State."   Id. at 639.  Under Minnesota law as it

existed at the time of Hanson's employment, same-sex domestic partners were not similarly situated with opposite-sex domestic partners.  MHR's "legitimate, nondiscriminatory basis for the [its] decision to offer benefits to same-sex couples . . . is[] the impediment to marrying in this State."  Id.  Thus, neither the MHRA's prohibition on discrimination based on marital status nor on sexual orientation prohibit MHR's policy.

### 2.    The Merits of Hanson's MHRA Claims: Termination

Hanson failed to address the claim that she was fired based on her sex, sexual orientation, or marital status in violation of the MHRA; thus she appears to have abandoned these claims.  In any case, they are not supported by the record.

### a)    Legal Standard

MHRA claims that do not involve direct evidence of discrimination are analyzed under the McDonnell Douglas framework.  Hansen v. Robert Half Int'l, Inc., 813 N.W.2d 906, 918 (Minn. 2012).  To establish a prima facie case of discriminatory discharge, Hanson must show that she is a member of a protected class; she was qualified for her position; she was discharged; and MHR assigned a nonmember of the protected class to do the same work.  Id.  If she proves a

prima facie case, MHR must articulate a legitimate non-discriminatory reason for the discharge.  The burden then shifts back to Hanson to demonstrate that the proffered reason is pretext for discrimination.  <u>Id.</u>

### b)    Discussion

Hanson cannot demonstrate a prima facie case because she was not qualified for her position, due to her dishonesty.  Also, she was replaced by two heterosexual female employees, one of whom was married and one of whom was not married.  Thus, she was replaced with an employee within her claimed protected class for each claim – sex, marital status, and sexual orientation.  However, to the extent that Hanson's sex discrimination claim is based on pregnancy, she was not replaced with a person within the protected class of pregnant women.

In any case, there is no evidence of pretext in this case, as the Court explained with regard to the FMLA and MPLA claims.  For example, MHR's proffered reason for termination was based on facts reflected in the record; there is no evidence that similarly situated employees outside of her various protected classes were treated differently; and there is no evidence that MHR deviated

from its policies in terminating her.  MHR is entitled to summary judgment on

Hanson's MHRA claims.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendant's Motion for Summary Judgment [Docket No. 13] is
**GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  May 31, 2013                     s/ Michael J. Davis                        
                                         Michael J. Davis
                                         Chief Judge
                                         United States District Court